***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman, the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following:
 STIPULATIONS
1. The parties are subject to the N.C. Workers Compensation Act.
2. An employee-employer relationship existed between the named employee and the named employer.
3. Zenith Insurance Company was the carrier on the risk.
4. The employee sustained an injury (or started missing time from work because of disease) on or about June 21, 1996, with the exact date to be determined by the Industrial Commission.
The Pre-Trial Agreement dated August 10, 1999 which was submitted by the parties at the hearing is incorporated by reference. The documents attached to the agreement were stipulated into evidence.
 ***********
Based upon all of the competent evidence of record, the Full Commission adopts the findings of fact of the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. As of June 21, 1996, plaintiff, who was then forty years old, had been employed by defendant-employer for two to three weeks at a convenience store and gas station in Wilson. She worked as a cashier at the store. There was a pizza counter there, as well, where another employee would be working.
2. Prior to her employment with defendant-employer, plaintiff had had episodes of emotional problems associated with abusive relationships. She sought treatment in 1991 at the Wilson-Greene Mental Health Center after separating from her husband who had physically abused her to the point that she apparently sustained a skull fracture. In 1995 she returned with additional problems associated with an abusive boyfriend, Vernon Farmer. She was given a prescription for an anti-depressant at the visit in December 1995. Shortly before that time, she separated from Mr. Farmer, with whom she had been living. On March 28, 1996 she saw Dr. Verma, a psychiatrist at the clinic, on an emergency basis due to depression and anxiety associated with fears of being attacked by Mr. Farmer who had been threatening her. Dr. Verma and Dott Tugwell, her therapist, both advised her to call the police and start legal action. Although plaintiff followed their advice and obtained a restraining order, Mr. Farmer continued to call, harass and threaten her. On May 1, 1996 when she saw Ms. Tugwell, she was so fearful and in such distress that it was difficult for her to leave her home or to sleep at night. She was admitted to the psychiatric unit of the local hospital about a week later at her own request.
3. Apparently plaintiff did not tell her co-workers about her problem with Mr. Farmer during the time she worked at the convenience store. However, on June 18, 1996 when she saw Dr. Verma, she reported that Mr. Farmer had blown up her current boyfriends truck. Dr. Verma recommended that she consider relocating.
4. On June 21, 1996 Vernon Farmer came into the convenience store where plaintiff was working. Since the store was busy she was unaware of Farmers presence until he was at the counter buying beer. After paying for it, Farmer threw it forcibly at her, striking her in the chest. Farmer then left the store. Plaintiff then exclaimed that Farmer was going to come back and kill her so she implored Ronnie Braziel, the supervisor on duty, to call the police. Mr. Braziel told plaintiff to put up the beer and said that Farmer would not be coming back so she should continue working. Plaintiff did continue working since there were so many people waiting to pay for gasoline and merchandise, but she repeatedly asked that the police be summoned because Farmer was coming back to kill her. Mr. Braziel simply made pizzas and ignored her.
5. Although plaintiff, who was in somewhat of a panic, did not think that she could stop working long enough to call the police herself, Mr. Farmer called the store, spoke to her and again threatened her life. She reported the threat to Mr. Braziel who still refused to call the police. Within twenty minutes of the time he left the store, Mr. Farmer returned with a handgun. Plaintiff saw him out of the corner of her eye as he pointed the gun at her and pulled the trigger. She ducked and threw up her right hand. The bullet blew away a section of her hand above the wrist. Mr. Farmer then reached over the counter and shot her in the leg. After shooting at her a third time, Mr. Farmer left the store.
6. Plaintiff was taken to the local emergency room where she was evaluated by Dr. Vanden Bosch. Due to the extensive bone and tissue damage to her right hand, he recommended that she be transferred to Duke Medical Center to be treated by the hand surgeons there. Consequently, she came under the care of Dr. Goldner. Dr. Goldner performed surgery that day to debride the unhealthy tissue from the hand, remove bone and metal fragments, and apply an external fixator device which would hold her hand and arm in alignment. He also removed the bullet from her leg. During the next month, plaintiff underwent multiple operations to her right hand. In one of the surgeries, a flap from her abdomen was attached to her hand in order to cover the wound.
7. Dr. Goldner continued to follow plaintiffs recovery. On March 26, 1997 he performed another operation in which he fused the bones in her wrist and inserted a metal plate in the gap between her wrist bones and the remaining bone above her knuckles. By November 24, 1997 when he last saw her, her wrist had fused satisfactorily. She had significant limitation of motion of her fingers and thumb, and profound weakness of the digits. However, Dr. Goldner was of the opinion that further surgery would not increase her function. The only purpose for another operation would be to contour the flap in order to improve the appearance of her hand. Plaintiff was not interested in that operation, however.
8. Plaintiff subsequently saw Dr. Rand in 1997 and 1998 for pain management treatment regarding her hand. On July 23, 1998 Dr. Rand indicated that she needed to be reevaluated at Duke regarding persistent symptoms and limitations. She had not returned to Duke by the date of hearing, however.
9. After her discharge from Duke Medical Center in August 1996, plaintiff apparently moved to Wilmington for a period of time in order to protect herself from further potential violence by Mr. Farmer. She was evaluated and treated by Elizabeth Garzarelli, a masters level psychologist, for an extreme case of post-traumatic stress disorder resulting from the attempted murder. Her level of fear was so high that she rarely left her bedroom, slept all day, expressed suicidal thoughts and had frequent nightmares. She also experienced extreme difficulty concentrating. She subsequently moved back to Wilson and returned to the Wilson-Greene Mental Health Center for further treatment. Dr. Verma concurred with the diagnoses of post-traumatic stress disorder, treated her with medication and referred her back to Dott Tugwell for further therapy. Despite treatment, plaintiff remained very symptomatic with anxiety, nervousness, depression and panic attacks up to the date of hearing such that it did not appear likely that she could return to work.
10. The shooting incident on June 21, 1996 was clearly an accident arising in the course of plaintiffs employment with defendant-employer. The fact that she was shot constituted an unusual occurrence which interrupted her regular work routine. She was performing her job duties as instructed at the time.
11. The motivation for the assault was entirely personal to plaintiff and had nothing to do with her employment. Mr. Farmer had previously demonstrated a pattern of domestic violence and was pursuing plaintiff based upon their earlier relationship, not because of any factors related to the convenience store. However, plaintiffs employment contributed to the assault to some degree in that, while knowing of the immediate threat, Mr. Braziel instructed plaintiff to continue working at the cash register and did not call the police. She followed his instructions and thereby remained vulnerable to the assault. Mr. Braziels testimony that he was unaware of the threat and gave no instructions to plaintiff is not accepted as credible. Nevertheless, the risk of the assault cannot be attributed to the employment. To the extent that the employment contributed to the incident, it was by virtue of the fact that an opportunity to reduce a personally motivated risk was not taken.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Although plaintiff sustained an injury by accident in the course of her employment on June 21, 1996, her injury did not arise out of her employment. N.C. Gen. Stat. 97-2(6); Robbins vs. Nicholson, 281 N.C. 234
(1972); Hemric vs. Reed and Prince Manufacturing Company, 54 N.C. App. 314
(1981), cert. denied, 304 N.C. 726 (1982).
2. Plaintiff is not entitled to benefits under the Workers Compensation Act for her injuries of June 21, 1996. N.C. Gen. Stat. 97-2 et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. This claim must, under the law, be and it is hereby DENIED.
2. Each side shall pay its own costs.
This 17th day of November 2000.
 S/________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_________________ LAURA K. MAVRETIC COMMISSIONER
DISSENTING:
 S/_________________ CHRISTOPHER SCOTT COMMISSIONER